FILED
2004 JUL -8 AM 9:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SERVICE SCAFFOLD & EQUIPMENT, INC., | }<br>}<br>} |
| Plaintiff, | }<br>} |
| v. | } Case No.: CV 04-P-616-S<br>} |
| ZACHRY CONSTRUCTION CORPORATION, | } **ENTERED**<br>} JUL - 8 2004<br>} |
| Defendant. | } |

**MEMORANDUM OPINION**

The court has before it Defendant Zachry Construction Corporation's Motion to Compel Alternative Dispute Resolution and to Dismiss Plaintiff's Complaint (Doc. # 3) filed April 15, 2004. The motion is fully briefed and the court heard oral argument on June 29, 2004.

**I.   Relevant Facts**

In September 2003, Plaintiff Service Scaffold & Equipment, Inc. ("SSE") and Zachry Construction Corporation ("Zachry") executed a "Services Agreement" whereby SSE agreed to work as a sub-contractor for Zachry and construct scaffolding for supplemental maintenance services in Indiana at a project called the "Gibson Generating Station." (Doc. # 3, Exs. B (hereinafter "Services Agreement" or "Agreement"), C).[1] The Agreement covered work performed from "on or about October 10, 2003 . . . through October 9, 2004, unless otherwise directed in writing by Zachry." (Doc. # 3, at Ex. B). According to the "Agreement Price" provision in the contract (Article 2), "Zachry shall pay to the Seller for the Work and Seller shall accept as full compensation therefore

---

[1] Zachry had previously entered into a contract with Cinergy Corporation to be the General Contractor at the project site. The Services Agreement was signed by SSE on August 27, 2003, and by Zachry on September 2, 2003.



the sum of NOT TO EXCEED ONE HUNDRED THOUSAND Dollars ($100,000.00)." (Doc. # 3, at Ex. B) (emphasis in original). "Exhibit A" to the Agreement further clarifies that "pricing for the Work shall be submitted to Zachry for approval and acceptance prior to Seller starting any Work." (Doc. # 3, at Ex. B).[2] Finally, Article 17 of the Agreement provides for a dispute resolution process triggered by any dispute that "arises out of or relates to this Agreement or its breach." (Doc. # 3, at Ex. B).[3]

---

[2] At oral argument in this case, Zachry argued that Exhibit A applies only to Article 1 ("Scope of Work") and cannot be construed to apply to Article 2 ("Agreement Price"). The court finds this dispute to be immaterial given that the provisions can be construed together "so that a harmonious operation can be given to each provision as far as the language used will permit." *United States Fidelity & Guaranty Co. v. Jacksonville State Univ.*, 357 So. 2d 952, 955 (Ala. 1978).

[3] Specifically, the Agreement provides that the following is to take place:

### ARTICLE 17. DISPUTE RESOLUTION

17.1 INITIAL DISPUTE RESOLUTION. If a dispute arises out of or relates to this Agreement or its breach, the Parties shall endeavor to settle the dispute first through direct discussions by their respective Site representatives. If the dispute cannot be settled by the Site representatives within fifteen (15) days, the Parties shall attempt to resolve the dispute by direct discussions of their senior officers. If the Parties' senior officers are unable to resolve the dispute within thirty (30) days, the Parties agree to proceed to mediation as provided below. . . .

17.2 MEDIATION. Upon failure of the Parties' senior officers to resolve the dispute within the time limit set forth above, the Parties agree to proceed to mediation under the Construction Industry Mediation Rules of the American Arbitration Association (AAA), and to conclude such mediation within sixty (60) days of the filing by a Party of a request to AAA for mediation. Each Party will pay its own costs plus an equal share of the cost of the mediator and mediation facilities.

17.3 ARBITRATION. If a dispute between the Parties to this Agreement cannot be resolved by mediation within sixty (60) days as agreed to above, the Parties shall submit the dispute to binding arbitration under the then prevailing Construction Industry Arbitration Rules of the AAA, which rules

At the time the Services Agreement was executed, SSE had not been awarded the specific work at boiler number five at Gibson Station which forms the basis of this lawsuit (hereinafter the "Work"). (Doc. # 5, Ex. D). By letters dated September 3, 2003 and September 4, 2003, SSE submitted its bid to perform the Work, detailing the proposed scope of work and specifically setting

---

will be subject to this clause. Thereafter, each Party will promptly request from AAA a current copy of AAA's "Roster of Neutrals for Large or Complex Construction Disputes." Each Party will have unlimited peremptory strikes of nominees, to be separately communicated to AAA within twenty (20) days after the Party's receipt of the AAA roster. From those nominees not stricken by either Party, AAA will appoint the first candidate (or the first three (3) candidates if the Parties will have mutually agreed to the appointment of a panel of arbitrators) to arbitrate the dispute. Discovery will be strictly limited: (1) each Party will promptly produce to the other all relevant and non-privileged documents for inspection and copying; and (2) each Party will promptly submit written reports of its testifying expert witnesses to the other Party, and permit the other Party reasonable opportunity to depose such expert witnesses. No further discovery will be permitted unless the arbitrator(s) will require otherwise, for good cause shown. The arbitration shall take place in San Antonio, Texas, or at such other location as the Parties may agree. The arbitrator(s) will declare the arbitration closed when satisfied the Parties' presentation of evidence is complete. Before arbitration is declared closed, a Party may withdraw and litigate a dispute if a non-affiliated third Party has filed, or threatened to file, suit against the withdrawing Party on a related claim and objected to joining the claim in the arbitration. The arbitration will be concluded as soon as reasonably possible. The award will be rendered in writing, and may include an award of attorneys' fees and costs as the arbitrator(s) will deem reasonable. The award will be final and binding, and may be entered in any court of competent jurisdiction. This agreement is subject to the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

17.4   NO INTERRUPTION OF WORK.  There shall be no interruption of the Work during the pendency of any dispute that may arise between the parties; provided, however, this Article does not limit or restrict the effectiveness of Zachry's orders suspending or terminating Seller's performance under this Agreement.

(Doc. # 3, at Ex. B).

3

out the proposed contract price of $205,102.80. (Doc. # 5, Ex. B) (hereinafter "September letters"). Zachry executed Purchase Requisitions for the Work on December 19, 2003, although the final agreed-upon contract differed from the work quoted in the September letters. (Doc. # 5, Ex. C) (hereinafter "Purchase Requisitions").

On March 24, 2004, SSE filed this lawsuit against Zachry asserting claims for breach of contract, quantum meruit, tortious interference with contractual or business relations, and defamation. (Doc. # 1). Zachry contends that this court should compel arbitration and dismiss this case because all of the claims asserted by SSE are subject to the dispute resolution procedures (including arbitration) contained in the Services Agreement. (Doc. # 3, Ex. B). SSE contends that the dispute in this case is not subject to the Services Agreement, but rather arises out of a separate contract – comprised of the September letters – that contains no arbitration provision. SSE further argues that, because the Services Agreement limits its application to projects under $100,000, it cannot govern the project at issue in this case which undisputedly was valued over $100,000.

## II.     Discussion

By its own terms, the arbitration clause contained in the Services Agreement is subject to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. ("FAA"). (Doc. # 3, at Ex. B, 17.3). "In enacting the FAA, Congress demonstrated a 'liberal federal policy favoring arbitration agreements.'" *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (citation omitted). As such, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Id.* at 947. "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds,*

*Inc. v. Byrd*, 470 U.S. 213, 218 (1985)(emphasis in original). Arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986).

Pursuant to the FAA, this court may consider only issues relating to "the making and performance of the agreement to arbitrate[],"determine whether a valid agreement to arbitrate exists and, if it does, ascertain whether the agreement encompasses the dispute at issue. *See Municipal Energy Agency of Mississippi v. Big Rivers Elec. Corp.*, 804 F.2d 338, 342 (5th Cir. 1986); *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967). Accordingly, the court must decide (1) whether the Services Agreement (and its arbitration provision) are valid and applicable to this lawsuit and (2) whether Plaintiff's claims fall within the scope of the arbitration provision which, by definition, governs all claims that "arise out of or relate to" the Services Agreement or any breach thereof.

  **A.**  **The Services Agreement Is Valid and Applicable to the Work in this Case**

The parties do not dispute that the arbitration provision contained in the Services Agreement is valid; rather, SSE contends that the Services Agreement *as a whole* is not applicable to the Work that forms the basis of this lawsuit. As discussed below, the court is persuaded that the Services Agreement – a written contract signed by both parties which contains specific dispute resolution procedures including a detailed arbitration provision – is applicable to the Work in this case.

Under Alabama law, this court will "accord [the terms of the contract] a reasonable construction under the terms used by the parties who made them, and when the contract contains several provisions, all are construed together so that a harmonious operation can be given to each

provision as far as the language used will permit." *United States Fidelity & Guaranty Co. v. Jacksonville State Univ.*, 357 So. 2d 952, 955 (Ala. 1978). "'It is settled law that if in its terms a contract is plain and free from ambiguity, then there is no room for construction and it is the duty of the court to enforce it as written.'" *Wheelan v. Sessions*, 50 F. Supp. 2d 1168, 1172 (M.D. Ala. 1999) (quoting *Ex parte S.C. Ins. Co.*, 683 So. 2d 987, 989 (Ala. 1996)). Finally, "[a] contract should be construed against the party who drafted the provision." *Landale Enterprises, Inc. v. Berry*, 676 F.2d 506, 508 (11th Cir. 1982).

SSE argues that the Services Agreement is not valid or applicable to this case for two reasons: (1) the September letters constitute the operating contract that governs this dispute,[4] rendering the Services Agreement inapplicable, and/or (2) the Services Agreement does not apply to the over $100,000 dispute in this case because the "Agreement Price" provision limits the Agreement applicability to disputes under $100,000. (Doc. # 5). The court is not persuaded by either approach.

First, the court is not convinced that the September letters – either alone or in conjunction with purchase orders and oral negotiations – constitute a separate contract, especially considering that Zachry never signed the September letters or accepted their terms exactly as proposed. (Doc. # 5, Ex. B). Although Zachry eventually authorized Purchase Requisitions for the Work proposed in the September letters, those requisitions were signed on December 19 – several months after the

---

[4] At oral argument before the court, SSE clarified that they maintain the September letters were bids to Zachry that, through oral negotiations and purchase orders signed by Zachry, became contracts for the Work in this case.

proposed terms of the September letters "expired." (Doc. # 5, Ex. B).[5]

Even assuming that the September letters *are* part of a valid agreement executed after the Services Agreement, their validity does not render void the Services Agreement, which governed the parties' relationship for any work performed during the relevant time period and which clearly allowed and incorporated subsequent additions and modifications approved by both parties. (See Doc. # 3, Ex. B, at "Exhibit A, Article 6, Article 11).[6] At best, the September letters/Purchase Requisitions are contractual modifications to the original Agreement – not, as SSE argues, "material alterations" that void the original contract. Regardless, there is no dispute that the arbitration provision of the original Agreement remains intact and was not modified or even addressed in the September letters/Purchase Requisitions. There is no evidence to suggest that the Services Agreement and its arbitration provision are invalid or inapplicable to the Work in this case.

Second, the court finds that SSE's interpretation of the "Agreement Price" provision as a $100,000 limitation on the Agreement's applicability is contrary to the plain language of the

---

[5] The September 3, 2003 letter proclaimed that "THIS PROPOSAL IS VALID FOR 60 DAYS FROM THE ABOVE DATE" and the September 4, 2003 letter stated "THIS PROPOSAL IS VALID FOR 30 DAYS FROM THE ABOVE DATE." (Doc. # 5, Ex. B (emphasis in original)).

[6] SSE's argument that the Services Agreement is a mere "agreement to agree" (because it does not reference any work at boiler number five and does not give a contract price) is not persuasive. (Doc. # 5). The Services Agreement is more than a promise to later agree – it specifically details the rules governing the parties' relationship for the duration of the specified time period of the Agreement. *See, e.g., Marubeni Corp. v. Mobile Bay Wood Chip Center*, 2003 WL 22466215, at *12 (S.D. Ala. June 16, 2003) (holding that the Agreement in that case, like the one in this case, was a master agreement which governed the business relationship between the parties and that "[n]one of the written documents should be viewed in a vacuum. Each reflects a further step in the evolution of the business relationship of the parties involved, beginning . . . with the . . . Agreement.").

7

Agreement as a whole.[7] Although Article 2 of the Agreement provides that "Zachry shall pay [no more than $100,000] to the Seller for the Work and Seller shall accept [that sum] as full compensation," other provisions of the Agreement unambiguously provide for subsequent price specification and modification.[8] For example, Exhibit A provides that "pricing for the Work shall be submitted to Zachry for approval and acceptance prior to Seller starting any Work," and Articles 6 and 11 clearly contemplate that agreed-upon modifications to the terms, including alterations to price, will be incorporated into the original Agreement. (Doc. # 3, Ex. B).[9] That the Work at issue in this case eventually cost over $400,000 does not render it outside the scope of the Services Agreement given that the $100,000 figure in the Agreement is unambiguously an initial price agreement subject to later modification – not a limitation on the Agreement's applicability.

> B. **All of Plaintiff's Claims Are Subject to Arbitration Because They "Arise out of or Relate To" the Agreement Between the Parties or a Breach Thereof.**

Having determined that the arbitration agreement is valid and governs the Work in this case, the court now turns to the question of whether Plaintiff's claims fall within its scope. The arbitration

---

[7] At oral argument, SSE argued that the $100,000 limit of the Services Agreement effectively rendered it inapplicable to *any* project agreed upon by SSE and Zachry at the Gibson Station because all of the projects completed at that site cost over $100,000. As noted earlier, SSE also maintains that the Services Agreement was executed by the parties before any work orders existed, rendering it a void "agreement to agree." SSE's arguments beg the question: Why did SSE sign a contract that was void from its execution and, regardless, would never have been applicable to work performed at the Gibson site given the $100,000 limitation?

[8] Article 6 of the Agreement incorporates by reference Agreement Documents that are executed after the Services Agreement, which may include, "Specifications, Drawings, Agreed Exceptions, Change Orders, documents and data furnished by Seller after the Effective Date that are approved and accepted in writing by Zachry's representative, and EEO Compliance Certificate, if applicable." (Doc. # 3, Ex. B).

[9] As discussed earlier, the court has rejected SSE's argument that Exhibit A must be read as applicable only to Article 1. *See* footnote 2 *supra*.

clause governs any dispute that "arises out of or relates to th[e Services] Agreement or its breach." (Doc. # 3, Ex. B). The Eleventh Circuit has defined the test for arbitrable claims as follows:

> Disputes that are not related – with at least some directness – to performance of duties specified by the contract do not count as disputes "arising out of" the contract, and are not covered by the standard arbitration clause. . . . However, where the dispute occurs as a fairly direct result of the performance of contractual duties . . . then the dispute can fairly be said to arise out of or relate to the contract in question.

*Telecom Italia v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001).

Although SSE argues that none of Plaintiff's claims arose out of the Services Agreement or its breach, that argument is meritless. The Plaintiff's complaint leaves little doubt that the underlying dispute in this case arises out of the scope of work outlined in the Services Agreement. There is no question that the Agreement governs the relationship between SSE and Zachary to provide "necessary labor, supervision, equipment and material to erect and dismantle scaffolding" at the Gibson Generating Station during the period beginning "on or about October 10, 2003 . . . through October 9, 2004." (Doc. # 3, at Ex. B, Ex. A "Scope of Work"). There is also no doubt that the facts underlying Plaintiff's complaint occurred as a direct result of SSE's performance of their contractual agreement to construct scaffolding at the Gibson project during the period from January 30, 2004 to on or about February 6, 2004. (Doc. # 1). Based on the clear terms of Plaintiff's complaint, Plaintiff's claims "occur[red] as a fairly direct result of the performance of contractual duties." *Telecom Italia*, 248 F.3d at 1116.

The court also rejects SSE's alternative argument that, even if the court finds that the breach of contract and quantum meruit claims occurred as a direct result of the contract (which they clearly did), *Telecom Italia* prevents arbitration of the Plaintiff's defamation and tortious interference claims

9

because Zachry's communications to Cinergy occurred independently of Zachry's contractual duties to SSE. The *Telecom Italia* case is distinguishable from the instant case.

In *Telecom Italia*, a telecommunications company ("Telecom") sued a reseller of telecommunications services ("WTC") for breach of contract and WTC brought a third party claim for tortious interference against Telecom's wholly owned subsidiary ("TMI"). *Telecom Italia*, 248 F.3d at 1111. TMI moved to dismiss or stay the proceedings pending arbitration, but the district court denied that motion and held that arbitration of the tortious interference claim was not required because the claim "neither arises out of nor is related to WTC's lease with TMI." *Telecom Italia*, 248 F.3d at 1116. The Eleventh Circuit affirmed, holding that,

> Even if TMI can be shown at trial to have tortiously interfered with [Telecom's] contract with WTC, there is no claim that TMI's performance of its contract [which contained the arbitration clause] with WTC was designed to, expected to, or likely to exert any pressure on [Telecom], unlike the harassment in *McBro*, which occurred as a result of the performance of a contractual duty.

*Id.*

In this case, unlike in *Telecom Italia*, the alleged tortious interference and defamatory statements occurred as a *direct result* of SSE's alleged nonperformance of its contractual duties to Zachry. Plaintiff's complaint alleges that, "[d]uring and/or subsequent to the construction of the scaffolding, Zachry Construction made false statements to Cinergy concerning work performed by SSE. As a result, SSE has not been permitted to perform further work for Cinergy." (Doc. # 1, at ¶ 11). Because SSE's alleged nonperformance of the contract was the catalyst for the alleged tortious interference and defamation, the court finds that those claims "occur[ed] as a fairly direct result of the performance of contractual duties" and therefore are subject to arbitration along with Plaintiff's claims for breach of contract and quantum meruit.

### III. Conclusion

Given that all of Plaintiff's claims in this case are subject to arbitration, the court finds that this case is due to be dismissed with prejudice. *See, e.g., Stiles v. Home Cable Concepts, Inc.,* 994 F. Supp. 1410, 1415-1416 and 1418-1419 (M.D. Ala. 1998) (finding that the matter was due to be dismissed with prejudice and sent to arbitration because "[w]here all of the issues raised in a complaint must be submitted to arbitration . . . a dismissal of the action is appropriate, since retaining jurisdiction and staying the action does not serve judicial economy."); *Clayton v. Woodmen of World Life Ins. Soc'y*, 981 F. Supp. 1447 (M.D. Ala. 1997) (same); *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (holding that dismissal, rather than a stay, is required, when all of the issues raised must be submitted to arbitration, noting that "[g]iven our ruling that all issues raised in this action are arbitrable and must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose."). A separate order will be entered.

**DONE** and **ORDERED** this ___7th___ day of July, 2004.

_____
R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE